Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 20, 2004      Decided August 17, 2004

No. 03-7057

JMM CORPORATION,
APPELLANT

v.

DISTRICT OF COLUMBIA AND
D.C. DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 02cv00406)

———

*Jonathan L. Katz* argued the cause and filed the briefs for appellant.

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Mary T. Connelly*, Assistant Corporation Counsel, argued the cause for appellees. With her on the brief was *Edward E. Schwab*, Assistant Corporation Counsel.

Before: HENDERSON, RANDOLPH, and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: JMM Corporation, the operator of an adult video store in the District of Columbia, sued the District in federal district court, alleging that its zoning regulations for such establishments were unconstitutional. In light of ongoing District of Columbia administrative and judicial enforcement proceedings against JMM, the district court dismissed the complaint under the abstention doctrine of *Younger v. Harris*, 401 U.S. 37 (1971). There is no doubt that the dismissal was appropriate if the District of Columbia is entitled to the benefit of that doctrine. We are therefore required to decide whether *Younger* is applicable to the District, a question this circuit has heretofore avoided.

JMM contends that, because the District of Columbia is not a state, its enforcement actions do "not merit the same protections" as would a state's. Reply Br. at 2. *Younger* will apply, the appellant insists, only "[i]f and when the District of Columbia attains statehood." *Id*. at 3. But the District does not have to wait until that day. We hold that the enforcement actions of the District of Columbia are entitled to the same respect that the federal courts accord those of the states, and therefore affirm the dismissal of JMM's complaint.

I

JMM, doing business as "Fun Fair Video," sells sexually explicit videos and provides booths for their viewing. Fun Fair is located in a "Community Business Center District" in the District of Columbia, an area that is not designated for "sexually-oriented business establishments" (SOBEs) under the District's zoning regulations.[1] Nor does Fun Fair have the required certificate of occupancy to operate as a SOBE.

---

[1] *See generally* D.C. MUN. REGS. tit. 11, §§ 199.1, 720, 744.1, 754.1, 1700.1, 1706.4, 3203, 3205; *id*. tit. 12, § 118.4.

In 2000, the D.C. Department of Consumer and Regulatory Affairs (DCRA) commenced the first of what became three sets of administrative enforcement actions against JMM. First, in April 2000, the DCRA issued JMM a notice of infraction for operating without a proper certificate of occupancy. In June 2000, the matter was heard by an Administrative Law Judge (ALJ) of the DCRA's Office of Adjudication. On June 20, the ALJ found that, while JMM had obtained a certificate of occupancy for a "video store not sexually oriented" (a "non-SOBE"), it was in fact operating a SOBE in a zone that was not designated for such use. The ALJ ordered JMM to cease doing business until it obtained a proper certificate. Although JMM had the right to appeal the ALJ's order to the D.C. Board of Appeals and Review, *see* D.C. MUN. REGS. tit. 1, § 503, and from there to the District of Columbia Court of Appeals, *see* D.C. CODE ANN. § 2–510, it did not do so.

Nor did JMM cease doing business. Indeed, JMM continued to operate as a SOBE throughout the course of the district court litigation, and is still doing so. It has not relocated, applied for a SOBE license, or ceased its business activities.

In September 2001, the DCRA issued a second set of notices of infraction to JMM, again for operating without a proper certificate. These, too, were heard before an ALJ. On March 5, 2002, the ALJ again found the charges proven, imposed fines, and ordered JMM to cease operations until it obtained a proper certificate. This time, JMM did appeal to the D.C. Board of Appeals and Review, where the matter is currently pending.

Meanwhile, on February 27, 2002, the DCRA instituted its third enforcement action, issuing notices of intent to revoke JMM's non-SOBE certificate of occupancy as well as its mechanical amusement license. In October 2002, an ALJ found in favor of the DCRA. JMM again appealed to the Board of Appeals and Review, where that appeal also remains pending.

4

On March 5, 2002—the day of the ALJ hearing on the 2001 infractions and a week after the DCRA issued its 2002 notices of revocation—JMM filed the instant action against the District of Columbia and the DCRA in the United States District Court for the District of Columbia. JMM's complaint, brought pursuant to 42 U.S.C. § 1983, alleged that the District's SOBE regulations violate the First, Fifth, and Fourteenth Amendments because, inter alia, they are unconstitutional content-based restrictions, and are vague and overbroad. JMM sought money damages, an order declaring the regulations unconstitutional, and an injunction against their enforcement. JMM also sought a preliminary injunction barring all pending enforcement actions.

On May 15, 2002, the district court denied the preliminary injunction, on the basis of the abstention doctrine of *Younger v. Harris*, 401 U.S. 37 (1971), and the absence of a risk of imminent irreparable injury. Mem. Op. & Order at 3 (D.D.C. May 15, 2002). Two months later, on July 12, 2002, the DCRA sued JMM in the Superior Court of the District of Columbia to enforce the uncontested June 20, 2000 ALJ decision that had ordered JMM to cease doing business. On March 31, 2003, the district court dismissed all of JMM's claims for injunctive and declaratory relief based on *Younger* abstention. At the same time, the district court stayed JMM's claims for money damages, pending JMM's appeals of the DCRA administrative enforcement orders and the District's civil enforcement action in D.C. Superior Court. The parties do not dispute that the stay was appropriate if the *Younger* doctrine was properly applied. *See Deakins v. Monaghan*, 484 U.S. 193, 202 (1988). JMM now appeals the dismissal of its claims for injunctive and declaratory relief.[2]

## II

In *Younger v. Harris* and its progeny, the Supreme Court held that, except in extraordinary circumstances, a federal court should not enjoin a pending state proceeding (including

---

[2]  We have jurisdiction to hear that appeal under the collateral order doctrine. *See Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 712–15 (1996).

an administrative proceeding) that is judicial in nature and involves important state interests. *Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 626–27 (1986); *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982); *Younger*, 401 U.S. at 41.[3] "This Court has never decided," however, "whether the District of Columbia is a state for *Younger* abstention purposes." *Bridges v. Kelly*, 84 F.3d 470, 476 n.8 (D.C. Cir. 1996). " 'Instead, every time the question has arisen, we have assumed that the doctrine applies to the District and nonetheless determined, in light of the facts of each particular case, that *Younger* abstention has not been appropriate.' " *Id.* (quoting *LaShawn A. v. Kelly*, 990 F.2d 1319, 1322 (D.C. Cir. 1993)).[4] In this case, however, we cannot simply assume the applicability of *Younger* abstention, because if applicable it would be appropriate here. *See infra* Part III. Accordingly, we must decide the question that this circuit has long avoided.

The *Younger* Court rested its abstention doctrine both on "equitable principles" and on "concerns for comity and federalism." *Ohio Civil Rights Comm'n*, 477 U.S. at 626–27; *see New Orleans Public Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 364 (1989); *Huffman v. Pursue*, 420 U.S. 592, 604 (1975); *Younger*, 401 U.S. at 43–44. We consider below the applicability of each of these considerations to proceedings brought by the District of Columbia.

## A

The first source of the policy against federal interference with state court proceedings identified by *Younger* was "the

---

[3] The Court extended *Younger* to declaratory as well as injunctive relief in *Samuels v. Mackell*, 401 U.S. 66, 73 (1971).

[4] *See, e.g.*, *District Properties Assocs. v. District of Columbia*, 743 F.2d 21, 28 n.4 (D.C. Cir. 1984); *Silverman v. Barry*, 727 F.2d 1121, 1123 n.4 (D.C. Cir. 1984); *Family Div. Trial Lawyers v. Moultrie*, 725 F.2d 695, 701 n.7 (D.C. Cir. 1984); *Sullivan v. Murphy*, 478 F.2d 938, 962 n.35 (D.C. Cir. 1973); *see also Handy v. Shaw, Bransford, Veilleux & Roth*, 325 F.3d 346, 352 n.7 (D.C. Cir. 2003).

basic doctrine of equity jurisprudence that courts of equity should not act … when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Younger*, 401 U.S. at 43–44, 46. In *Trainor v. Hernandez*, the Court explained that these "two classic preconditions for the exercise of equity jurisdiction"—no adequate remedy at law and irreparable injury—"assumed new dimensions" in *Younger*. 431 U.S. 434, 441 (1977). The adequate remedy at law "inquiry was to be broadened to focus on the remedies available in the pending state proceeding" as compared to the federal action. *Id.* And the "other precondition for equitable relief—irreparable injury—would not be satisfied unless the threatened injury was both great and immediate." *Id.* at 442; *see Younger*, 401 U.S. at 48–49.

These two principles apply in full measure to District of Columbia enforcement proceedings. First, the defendant in District proceedings has an adequate remedy for its asserted constitutional violations because it has "an opportunity to raise [its] constitutional claims" as defenses, *Younger*, 401 U.S. at 49. Where the proceedings begin in Superior Court, the defendant can raise any constitutional claims in that court,[5] appeal an adverse decision to the District of Columbia Court of Appeals,[6] and if still dissatisfied seek review in the United States Supreme Court.[7] Where the proceedings begin at the administrative level, the defendant can appeal to and make its constitutional challenges in the D.C. Court of Appeals,[8] and again seek further review in the Supreme

---

[5] *See* D.C. CODE ANN. §§ 11–921, –923.

[6] *See* D.C. CODE ANN. § 11–721.

[7] *See* 28 U.S.C. § 1257(a), (b).

[8] *See* D.C. CODE ANN. § 2–510(a) (providing that any person adversely affected or aggrieved by an agency decision "is entitled to a judicial review thereof" in the D.C. Court of Appeals); *id.* § 2–510(a)(1) (providing that the D.C. Court of Appeals' authority to review administrative agency proceedings includes the power "to decide all relevant questions of law, to interpret constitutional and statutory provisions, and to determine the meaning or applicability of the terms of any action"); *see also id.* § 11–722.

Court.[9] Whether or not the defendant can also raise its constitutional defenses at the administrative level, "it is sufficient under [*Younger*] that constitutional claims may be raised in state-court judicial review of the administrative proceeding." *Ohio Civil Rights Comm'n*, 477 U.S. at 629.[10]

Second, the defendant in a District proceeding will not suffer irreparable injury by being foreclosed from obtaining an injunction in federal court. As *Trainor* explained, the burden of defending an enforcement action is "not sufficient to warrant interference by the federal courts with legitimate state efforts to enforce state laws; only extraordinary circumstances would suffice." 431 U.S. at 442.[11] Such extraordinary circumstances include situations in which "there is a showing of 'bad faith' or 'harassment' by state officials responsible for the prosecution," or "where the state law to be applied . . . is 'flagrantly and patently violative of express constitutional prohibitions.'" *Id.* at 443 n.7 (quoting *Younger*, 401 U.S. at 53–54). There is no reason why these factors cannot be applied to District proceedings as readily as to state proceedings, with injunctions being permitted only where the appropriate showings are made. Accordingly, there is nothing about the equity source of the *Younger*

---

[9] *See* 28 U.S.C. § 1257.

[10] As noted in Part III, it is well settled that *Younger* applies "to state administrative proceedings in which important state interests are vindicated, so long as in the course of those proceedings the federal plaintiff would have a full and fair opportunity to litigate his constitutional claim," *Ohio Civil Rights Comm'n*, 477 U.S. at 627, and the proceedings are "judicial in nature," *Middlesex*, 457 U.S. at 433–34. Because these prerequisites demand a case-by-case determination of the appropriateness of applying *Younger* to a specific District administrative proceeding, our holding is, of course, limited to the specific proceedings before us—as to which the prerequisites are satisfied.

[11] *Younger* held this to be true even where a defendant levels a facial First Amendment challenge against a regulation and contends that its existence has a chilling effect on his free speech. *See Younger*, 401 U.S. at 54; *infra* note 24.

doctrine that precludes its application to the District of Columbia.

## B

The second source of the *Younger* abstention doctrine—identified as the " 'more vital consideration' "—was "concerns for comity and federalism." *Ohio Civil Rights Comm'n*, 477 U.S. at 626–27 (quoting *Younger*, 401 U.S. at 44); *see Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 723 (1996); *New Orleans*, 491 U.S. at 364. *Younger*'s federalism concern does not apply per se to the District of Columbia, because "[t]he federal seat of government is constitutionally different from the states," *Madley v. United States Parole Comm'n*, 278 F.3d 1306, 1308 (D.C. Cir. 2002), and "the Superior Court is a congressionally created court and, thus, 'federal' in its creation." *Handy v. Shaw, Bransford, Veilleux & Roth*, 325 F.3d 346, 351 (D.C. Cir. 2003). But *Younger*'s larger concern for comity—proper respect for a coordinate legal system—plainly does apply.

As the Court explained in *Huffman*, *Younger*'s comity/federalism component requires courts to "abide by standards of restraint that go well beyond those of private equity jurisprudence." 420 U.S. at 603. Comity includes the concern that "interference with a state judicial proceeding prevents the state . . . from effectuating its substantive policies," *id.* at 604, and "disrupt[s] the State's efforts to protect interests which it deems important," *id.* at 608. "Such interference," the Court said, "also results in duplicative legal proceedings, and can readily be interpreted as 'reflecting negatively upon the state courts' ability to enforce constitutional principles.' " *Id.* at 604 (quoting *Steffel v. Thompson*, 415 U.S. 452, 462 (1974)). As we said in *Family Division Trial Lawyers v. Moultrie*, "[t]he only justification for federal court interference during a state proceeding would be a premise that the state courts cannot be trusted to adequately protect federal constitutional rights, a premise unequivocally rejected by the *Younger* court." 725 F.2d 695, 701 (D.C. Cir. 1984).

All of these comity concerns apply with equal force to the District of Columbia. *See generally id.* Federal court interference with District enforcement proceedings may prevent the District from effectuating its substantive policies and disrupt its efforts to protect interests it regards as important. It will certainly result in duplicative legal proceedings and may be interpreted to reflect negatively on the District's ability to enforce constitutional principles. But just as with a state, there is no reason to presume that the courts of the District cannot be trusted to adequately protect federal constitutional rights. To the contrary, "Congress has created a trial and appellate court system of general jurisdiction for the District separate from the United States courts (of which we are a part) and intended to serve the District in much the same manner as the court systems of the various states." *Madley*, 278 F.3d at 1308.

In 1970, Congress reorganized the courts of the District of Columbia pursuant to its authority under Article I, § 8, cl. 17 of the Constitution. *See Palmore v. United States*, 411 U.S. 389, 390–92 (1973); D.C. CODE ANN. § 11–101(2). Prior to passage of the District of Columbia Court Reorganization Act of 1970 (DCCRA),[12] the local court system had limited jurisdiction, and the United States District Court for the District of Columbia "had concurrent jurisdiction with the Court of General Sessions [one of three local trial courts] over most of the criminal and civil matters handled by that court." 411 U.S. at 392 n.2 (citing D.C. CODE ANN. §§ 11–521 through 523 (1967)). The DCCRA transferred "all 'local' jurisdiction . . . from the Federal courts to a new Superior Court of the District of Columbia and the District of Columbia Court of Appeals." H.R. REP. NO. 91–907, at 23 (1970).[13] A substantial impetus for "the total transfer of local jurisdiction" out of the federal courts into the reorganized local court system was the "overall problem of concurrent jurisdiction," which had produced a "ping-pong" between the federal and local courts,

---

[12] Pub. L. No. 91–358, tit. I, § 111, 84 Stat. 473, 475–521 (1970).

[13] *See* D.C. CODE ANN. §§ 11–101, –721, –901, –921, –923.

particularly with respect to the "disposition of criminal matters." *Id.* at 33.

Congress' intent was to give the District "a court system comparable to those of the states," H.R. REP. NO. 91–907, at 23, one "separate and apart from the United States District Court and the United States Court of Appeals for the District of Columbia Circuit," *id.* at 5. In "constituting the lower trial court as a purely local court, similar to a state court, it follow[ed] that appeals from the local court should be treated like those in the state systems, and that the channel of appeals should be directly to the United States Supreme Court." *Id.* at 34–35. Thus, the reorganization made "the District of Columbia Court of Appeals the highest local court," *id.* at 35, "similar to a state Supreme Court," *id.* at 5, and made its decisions reviewable by the United States Supreme Court, *id.* at 35.[14] The House Report stated that, when the reorganization was complete, "the United States District Court for the District of Columbia" would be "on a par with other United States District Courts, exercising federal jurisdiction only, and the Superior Court of the District of Columbia will have all purely local jurisdiction." *Id.* at 34.[15]

As both this court and the Supreme Court have noted, "from [the passage of the DCCRA] onward, the relationship of the federal to the local judiciary was to be akin to that historically existent in the states." *Steorts v. American*

---

[14]  *See* 28 U.S.C. § 1257(b) (treating the D.C. Court of Appeals as the "highest court of a state" for purposes of Supreme Court review by certiorari); *id.* § 2113 (treating the D.C. Court of Appeals as a "state court" and "the highest court of a state" for purposes of other Supreme Court review provisions); *see also* D.C. CODE ANN. § 11–102. In *Huffman*, a case that extended *Younger* beyond state criminal proceedings, the Supreme Court put significant weight on the availability of federal court review through § 1257 for "any federal claim properly asserted in and rejected by state courts." 420 U.S. at 605.

[15]  *See also* 28 U.S.C. § 1451 (treating the Superior Court as a state court for purposes of removal jurisdiction).

*Airlines, Inc.*, 647 F.2d 194, 196 (D.C. Cir. 1981).[16] Accordingly, "both our case law and other federal statutes treat the D.C. courts like state courts." *Handy*, 325 F.3d at 351 n.5.[17] Indeed, it should not escape notice that the very statute upon which JMM relies for its cause of action in this case, 42 U.S.C. § 1983, treats the District of Columbia as if it were a state.[18]

---

[16] *See Key v. Doyle*, 434 U.S. 59, 64 (1977) ("The Aim of the [DCCRA] was to establish 'a Federal–State court system in the District of Columbia analogous to court systems in the several States.'") (quoting H.R. REP. NO. 91–907, at 35); *Palmore*, 411 U.S. at 392 n.2 (noting that the DCCRA "invested the local courts with jurisdiction equivalent to that exercised by state courts").

[17] *See Madley*, 278 F.3d at 1308 (treating a court of the District as a state court for purposes of a petition for habeas corpus under 28 U.S.C. § 2253(c)); *United States v. District of Columbia*, 669 F.2d at 741 & n.4 (treating the District as a state for purposes of jurisdiction under 28 U.S.C. § 1345); *Steorts*, 647 F.2d at 196–97 (holding that the substantive law of the forum controls in diversity cases in the District as it does in a state); *see also District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 476 (1983) (holding that final determinations of the D.C. Court of Appeals, like those of state courts, are reviewable only by the U.S. Supreme Court); statutes cited *supra* notes 14, 15.

[18] *See* 42 U.S.C. § 1983 (providing that "[e]very person who, under color of any statute, ordinance, [or] regulation ... of any State or Territory *or the District of Columbia*, subjects ... any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured") (emphasis added); *see also* 28 U.S.C. § 1332(d) (treating the District as a state for purposes of diversity jurisdiction); *id.* § 1367(e) (treating the District as a state for purposes of supplemental jurisdiction). The District has not, however, been treated as a state for all purposes. *See, e.g.*, *Palmore*, 411 U.S. at 395 (holding that a statute of the District of Columbia was not "a 'statute of any state' within the meaning of" then–28 U.S.C. § 1257(2), which defined the scope of Supreme Court review by appeal (as distinct from certiorari)); *District of Columbia v. Carter*, 409 U.S. 432 (1973) (holding that the District was not a state for purposes of the pre–1979 version of 42 U.S.C. § 1983).

Moreover, this circuit has treated the District of Columbia courts as state courts in the application of two other abstention doctrines. One is *Pullman* abstention, which holds that "when a federal constitutional claim is premised on an unsettled question of state law, the federal court should stay its hand in order to provide the state courts an opportunity to settle the underlying state-law question and thus avoid the possibility of unnecessarily deciding a constitutional question." *Harris County Comm'rs Court v. Moore*, 420 U.S. 77, 83 (1975) (citing *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496 (1941)); *see Justice v. Superior Ct. of District of Columbia*, 732 F.2d 949, 950 (D.C. Cir. 1984) (applying *Pullman* to the District). Like *Younger* abstention, *Pullman* abstention is based on considerations of both equity and comity.[19] The other abstention doctrine—known as *Colorado River* abstention—permits discretionary abstention in light of parallel proceedings in another court. *See Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). In that context, we have reviewed "dismissal in favor of parallel proceedings in Superior Court under the standard applicable to a parallel state court proceeding," *see Handy*, 325 F.3d at 351, rather than under the standard applicable to a parallel proceeding in another federal district court, *see id.* at 350.[20] Finally, we note that the First Circuit has applied

[19]　*See Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 12 n.9 (1987) (noting that "considerations similar to those that mandate *Pullman* abstention are relevant to a court's decision whether to abstain under *Younger*"); *Harrison v. NAACP*, 360 U.S. 167, 177 (1959) (noting that *Pullman* abstention "serves the policy of comity inherent in the doctrine of abstention"); *Pullman*, 312 U.S. at 501 (declaring that abstention is "appropriate to our federal system whereby the federal courts, exercising a wise discretion, restrain their authority because of scrupulous regard for the rightful independence of the state governments and for the smooth working of the federal judiciary") (internal quotation marks omitted).

[20]　*See Reiman v. Smith*, 12 F.3d 222, 223–25 (D.C. Cir. 1993) (applying *Colorado River* abstention analysis to parallel Superior Court proceeding). In *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, the Court noted that *Colorado River*

*Younger* itself to Puerto Rico's local court system and administrative proceedings, *see, e.g., Maymo–Melendez v. Alvarez–Ramirez*, 364 F.3d 27 (1st Cir. 2004), which are entitled to no greater comity than those of the District of Columbia.[21]

---

In sum, the general considerations of comity described in the *Younger* line of cases apply with full force to the District of Columbia. And while comity's federalism component does not apply per se, Congress has made clear that it intends federal courts generally to treat the District of Columbia judicial system as if it were a state system, an intent that this circuit has long respected and effectuated. When these considerations are combined with the fact that the other source of the *Younger* doctrine—principles of equity jurisprudence—are also fully applicable to the District of Columbia, the conclusion that this circuit should regard the District as a state for purposes of *Younger* abstention is inescapable.

## III

The remaining issue, the application of *Younger* to this case, is straightforward and breaks no new ground. In *Younger*, the plaintiff had been charged in state court with violating the California Criminal Syndicalism Act. He then filed a complaint in federal court alleging that the Act on its face, and his prosecution thereunder, violated his First Amendment right of free speech. A three-judge district

---

abstention "rest[s] not on considerations of state-federal comity, . . . but on considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." 460 U.S. 1, 14–15 (1983) (internal quotation marks omitted).

[21] The Supreme Court has also applied *Pullman* abstention to Puerto Rico. *See Fornaris v. Ridge Tool Co.*, 400 U.S. 41, 44 (1970) (directing the district court to stay its decision regarding the constitutionality of a Puerto Rico law until the Puerto Rico Supreme Court was given an opportunity to construe it in a way that might avoid constitutional infirmity).

court found the statute void for vagueness and overbreadth, and enjoined the prosecution. 401 U.S. at 40. The Supreme Court reversed, holding that federal courts should not enjoin pending state criminal proceedings absent extraordinary circumstances. *Id*. at 40–41, 48–54. In *Huffman*, the Court extended *Younger* to pending civil court proceedings in which important state interests are involved. 420 U.S. at 604; *see Ohio Civil Rights Comm'n*, 477 U.S. at 627.

Although the District did not file its Superior Court action against JMM until two months after JMM filed its federal complaint, *Younger* applies as long as the state proceedings were initiated " 'before any proceedings of substance on the merits have taken place in the federal court.' " *Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 238 (1984) (quoting *Hicks v. Miranda*, 422 U.S. 332, 349 (1975)). The district court correctly held that to be the case here, because the only thing that had transpired before the filing of the Superior Court action was the denial of JMM's motion for a preliminary injunction on the basis of *Younger* and the absence of a risk of imminent irreparable injury. *See Middlesex County*, 457 U.S. at 436–37 (holding that dismissal of a federal complaint on *Younger* grounds, followed by an appeal on that issue, were not proceedings on the merits such as to render *Younger* inapplicable to a subsequent state court proceeding); *id.* at 437 (noting that where "the sole issue [in the federal action] has been whether abstention is appropriate," there are "no federal proceedings on the merits [that] will be terminated by application of *Younger* principles").

Moreover, although the Superior Court action was not yet pending at the time JMM filed its federal complaint, the DCRA administrative proceedings were and had been for some time. The Supreme Court has extended *Younger* to pending administrative enforcement actions where the state proceedings are judicial in nature and the state interests are important. *Ohio Civil Rights Comm'n*, 477 U.S. at 626–27 & n.2; *Middlesex County*, 457 U.S. at 432–34. Both are true here. The Court has regarded administrative adjudications

like those undertaken by the ALJ and the Board of Appeals and Review as judicial in nature.[22] And it has also found that the enforcement of zoning regulations, like those at issue here, constitutes an important state interest.[23] Indeed, in observing that "lower courts have been virtually uniform in holding that the *Younger* principle applies to pending state administrative proceedings in which an important state interest is involved," the Supreme Court cited approvingly a Seventh Circuit case dealing with a municipal zoning ordinance that governed the licensing of motion picture theaters. *Ohio Civil Rights Comm'n*, 477 U.S. at 627 n.2 (citing *Grandco Corp. v. Rochford*, 536 F.2d 197, 206 (7th Cir. 1975)); *cf. Huffman*, 420 U.S. at 604, 608 (regarding as important the state's interest in civil litigation seeking to close a theater that exhibited pornographic films).

[22] *See Ohio Civil Rights Comm'n*, 477 U.S. at 627 & n.2 (finding that an employment discrimination complaint filed in an administrative proceeding by a state civil rights commission was judicial in nature); *Middlesex County*, 457 U.S. at 433–34 (holding that bar disciplinary proceedings were "judicial in nature"); *see also New Orleans Pub. Serv.*, 491 U.S. at 370–71 (explaining that the "proper characterization" of a proceeding "depends not upon the character of the body but upon the character of the proceedings," and holding that "a judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist," while a legislative inquiry "looks to the future and changes existing conditions by making a new rule to be applied thereafter") (internal quotation marks omitted); *id* at 371 (holding that ratemaking is "an essentially legislative act" and not a judicial one).

[23] *See City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 435–37 (2002) (upholding a zoning restriction against multiple adult entertainment establishments in light of a substantial state interest in reducing crime); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 50 (1986) (upholding a zoning ordinance restricting the location of adult movie theaters because the ordinance was connected to "a substantial government interest" in suppressing secondary effects on the surrounding neighborhood, including crime).

For *Younger* abstention to be appropriate in the face of pending state proceedings, the federal plaintiff must "have a full and fair opportunity to litigate" its constitutional claims in those proceedings. *Ohio Civil Rights Comm'n*, 477 U.S. at 627; *Trainor*, 431 U.S. at 441. As discussed in Part II.A, JMM will have the opportunity to assert all of its constitutional claims as defenses in the Superior Court action. Indeed, according to JMM's own counsel, it has already done so. *See* Status Hr'g Tr. at 7–10 (App. 17–20) (representation of JMM's counsel to the district court). And whether or not it can do so in the administrative enforcement proceedings, an issue the parties dispute, the results of those proceedings are appealable to the D.C. Court of Appeals, where all of JMM's constitutional claims can also be heard. *See supra* Part II.A.[24]

Finally, as also noted in Part II.A, we must consider whether there are "extraordinary circumstances warranting equitable relief." *Trainor*, 431 U.S. at 446. These may exist where "the pending state action was brought in bad faith or for the purpose of harassing" the federal plaintiff, or "where a state statute is flagrantly and patently" unconstitutional. *Id.*

---

[24] JMM claims that its facial attacks on the constitutionality of the zoning regulations cannot be heard on review of the DCRA enforcement actions. But they plainly are defenses to those actions and therefore can be heard on appeal. Nor does the fact that JMM has added a facial First Amendment challenge to its attack on the enforcement actions take its complaint outside the scope of *Younger*. *See Huffman*, 420 U.S. at 602 (noting that the Court has "unequivocally held that facial invalidity of a statute is not itself an exceptional circumstance justifying federal interference with state criminal proceedings"); *Younger*, 401 U.S. at 50, 54 (holding that neither a "chilling effect" nor "the possible unconstitutionality of a statute on its face" justifies "an injunction against good-faith attempts to enforce" a statute) (internal quotation marks omitted). JMM further urges that, even if its general facial attacks can be heard as a defense, one of its specific claims—that it cannot obtain a SOBE for another location because there is no realistic process for doing so—would not constitute an enforcement defense. We do not see why that would be so, since this claim amounts to an allegation that the District's SOBE zoning system is a sham.

at 446–47 (internal quotation marks omitted); *see Middlesex*, 457 U.S. at 437; *Younger*, 401 U.S. at 53–54. But JMM alleges no bad faith harassment here, nor does it contend that the District's zoning regulations meet the "flagrant and patently" unconstitutional threshold. Indeed, the latter would be a particularly difficult case to make in light of Supreme Court opinions upholding similar zoning restrictions against First Amendment attack. *See City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 439 (2002); *City of Renton v. Playtime Theatres*, 475 U.S. 41, 50 (1986).

To summarize: The ongoing District of Columbia proceedings are judicial in nature and implicate important District interests; those proceedings afford JMM an adequate opportunity to litigate its federal claims; and there are no extraordinary circumstances warranting equitable relief. Accordingly, the criteria for application of the *Younger* doctrine have been satisfied, and the district court's dismissal of JMM's complaint was appropriate.

## IV

We conclude that the District of Columbia is a state for purposes of *Younger* abstention, and that such abstention is warranted in this case. Accordingly, the judgment of the district court is

*affirmed.*